United States District Court
Southern District of Texas
**ENTERED**
March 27, 2017
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| ELDORA FIELDER CHRISTIAN, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. 4:15-cv-3714 |
| NANCY A. BERRYHILL,[1] Acting | § | |
| Commissioner of the Social Security | § | |
| Administration, | § | |
| | § | |
| *Defendant*. | § | |
| | § | |

## MEMORANDUM OPINION

Plaintiff seeks judicial review of the Acting Commissioner of the Social Security Administration's ("the Commissioner") decision denying her application for Social Security disability insurance benefits. The parties consented to have this Court decide the matter pursuant to 28 U.S.C. § 636(c) and filed cross-motions for summary judgment. As explained below, the Court **GRANTS** Plaintiff's motion, **DENIES** the Commissioner's motion, and **REMANDS** the case to the Commissioner for further proceedings consistent with this opinion.

## I. BACKGROUND

### A. Procedural Background

In August 2012, Plaintiff applied for disability insurance benefits under Title II of the Social Security Act ("the Act"). R. 216–24.[2] The Social Security Administration denied her application initially and upon reconsideration. R. 159–71. Pursuant to Plaintiff's request, a

---

[1] On January 23, 2017, Nancy A. Berryhill succeeded Carolyn W. Colvin as Acting Commissioner of the Social Security Administration. *Parrish v. Berryhill*, No. 4:15-cv-3717, 2017 WL 713567 n.1 (S.D. Tex. Feb. 21, 2017). Pursuant to Federal Rule of Civil Procedure 25(d), Acting Commissioner Berryhill is substituted as Defendant in this action.

[2] "R." citations are to the electronically-filed record, ECF No. 4.

1

hearing was held on February 21, 2014 before Administrative Law Judge William B. Howard ("the ALJ"). R. 125–58. Plaintiff, who was represented by counsel, testified at the hearing, as did a vocational expert. On July 2, 2014, the ALJ issued an unfavorable decision, concluding that Plaintiff was not disabled within the meaning of the Act and therefore not entitled to the benefits for which she applied. R. 105–19. Plaintiff timely requested that the Appeals Council review the ALJ's decision. R. 89–91. The Appeals Council denied that request, R. 1–6, after which Plaintiff commenced this action, Pl.'s Compl., ECF No. 1. The Court heard argument on the parties' cross-motions for summary judgment on December 7, 2016.

**B. Factual Background**

**1. Plaintiff's Work History**

Plaintiff was born on December 12, 1967 and was 46 years old at the time of the hearing before the ALJ. R. 132. She earned a GED in February 2007. R. 133. From 1998 until early 2012, Plaintiff worked as a patient care provider, first in an assisted living facility and later in patients' homes. R. 134–36. Her job duties included bathing and grooming patients, preparing their meals, doing their laundry and shopping, making their beds, monitoring their vital signs, and ensuring that they took their medications. R. 134. Plaintiff has experienced chronic pain since 1986. R. 657. In November 2011, she was involved in a car accident, which she believes triggered many of her current physical impairments. R. 137, 313–20. She returned to work a week after the accident, but found herself unable to stoop, bend, or turn patients over. R. 137. These limitations impeded Plaintiff's work to such an extent that Plaintiff and the agency for which she worked mutually agreed to end her employment. R. 138. Plaintiff did not seek further employment thereafter. R. 138–39.

### 2. Plaintiff's Medical History

Between early 2012 and mid-2013, Plaintiff received medical treatment at hospitals and other health care locations. R. 139, 321–509, 541–612. In February 2012, Plaintiff presented at a community clinic with "muscle spasms/joint pain." R. 333. Later that month, Plaintiff was hospitalized for chest pain, dizziness, neck/back pain with radiculopathy,[3] and anxiety. R. 336–38. A physician's note from that visit states that Plaintiff might have been suffering from "cervical radiculopathy from shoulder/neck trauma at work where she helps move an elderly woman," but imaging tests were normal. R. 338. A neurological assessment concluded that Plaintiff had 5/5 strength in her upper extremities and feet, but a full examination of strength in her lower extremities could not be performed "due to pain." R. 344. In March 2012, Plaintiff received treatment for cervical radiculopathy, chronic pain syndrome, and back pain, and was referred for pain management. R. 487–88. In May 2012, Plaintiff was assessed with joint pain in her shoulder region following an examination. R. 482. In August 2012, Plaintiff reported "having constant pain in her lower abdomen," experiencing "sharp sho[o]ting pains in her legs," and "suffering with back pain since her first car wreck in 1986." R. 460. Plaintiff was reported positive for back pain, negative for joint swelling, and found to have a normal range of motion. R. 461. In October 2012, Plaintiff sought treatment for hypertension and pain in her back, joints, ankle, and feet; she was noted as "positive for back pain and arthralgias,"[4] but was found to have a "[n]ormal range of motion." R. 445–49. A December 2012 medical assessment stated that Plaintiff was suffering from "acute" "aching" pain in her "left knee/left side." R. 444.

---

[3]  "Radiculopathy" is a "[d]isorder of the spinal nerve roots." Stedman's Medical Dictionary 748650, Westlaw (database updated Nov. 2014).

[4]  "Arthralgia" is a medical term for "pain in a joint." Stedman's Medical Dictionary 75390, Westlaw (database updated Nov. 2014).

In July 2013, Plaintiff began receiving regular medical treatment from Dr. Rhonda Barnes-Jordan, M.D. ("Dr. Barnes-Jordan"). R. 661. A medical report from Plaintiff's first visit to Dr. Barnes-Jordan on July 31, 2013 contains the following pertinent observations:

> Patient complains of joint pain. The patient notes diffuse joint pain. This has been a problem for the past more than 5 years. She describes the discomfort as unbearable. Symptoms have been mild or transient punctuated by episodic flare-ups. Primary joints affected include the cervical and lumbar spine, shoulders, elbows, wrists, hands, fingers, hips, knees, ankles, feet, and toes. Muscle groups affected include both gastrocnemius and the hamstrings. Associated symptoms include fatigue, sleep problems, depression, joint stiffness, swollen joints, joint warmth and night sweats. . . . Pertinent medical history is remarkable for injury long ago from auto accident and joint trauma (Pt has been in 3 car accidents 1986, 1996, 2011).

R. 661. The report further described Plaintiff's gait as "affected by a limp and slowed" and noted tenderness in "both legs and arms and lower back." R. 663. Dr. Barnes-Jordan assessed Plaintiff as having "diffuse arthralgia" and "dysmetabolic syndrome X" and prescribed her various medications. R. 663.

Plaintiff visited Dr. Barnes-Jordan again on at least seven occasions: August 21, 2013, R. 657–60, 692–95; October 21, 2013, R. 652–56, 687–91; October 24, 2013, R. 686; November 6, 2013, R. 647–51, 682–85; January 13, 2014, R. 638–46, 673–81; January 21, 2014, R. 633–37, 668–72; and February 5, 2014, R. 712, 714–19. The "assessment" and/or "current problems" sections of the medical records from these visits show that Dr. Barnes-Jordan repeatedly noted Plaintiff as having the following conditions (among others): diffuse arthralgia,[5] fatigue,[6] dysmetabolic syndrome X,[7] muscle spasm,[8] and a body mass index consistent with obesity.[9]

---

[5]  R. 658–59, 653–54, 648, 639, 634, 715.

[6]  R. 659, 653, 648, 639, 634, 715.

[7]  R. 658, 653, 648, 639–40, 634, 715–16.

[8]  R. 653–54, 648, 644.

Between November 6, 2013 and February 5, 2014, Dr. Barnes-Jordan also repeatedly recorded Plaintiff as having hip pain,[10] knee pain,[11] low back pain,[12] and female pelvic pain.[13] The "review of systems" ("ROS") portions of Dr. Barnes-Jordan's records show that: on August 21, 2013, Plaintiff was found "negative" for arthralgias, back pain, and myalgia,[14] R. 657; on October 21, she was found "positive" for arthralgias, back pain, shoulder pain, knee pain, and hip pain, but negative for joint stiffness, limp pain, and myalgia, R. 653; on November 6, she was found positive for left knee and hip pain, but negative for arthralgias, back pain, joint stiffness and myalgia, R. 647; on January 13, 2014, she was found positive for arthralgias, back pain, joint stiffness and "limb pain (knee pain)," R. 638; on January 21, 2014, she was found positive for "limb pain (Bilateral knee pain)" and negative for arthralgias, back pain, joint stiffness and myalgia, R. 633; and on February 5, 2014, she was found positive for "limb pain (left knee)" and negative for arthralgias, back pain, joint stiffness and myalgia, R. 712, 714.

Dr. Barnes-Jordan's notes from January 21, 2014 show that Plaintiff complained of chronic low back pain with episodes of acute exacerbation and bilateral knee pain. R. 633. The doctor noted that "[t]he pattern of joint symptoms has been progressive worsening." *Id.* X-rays ordered by Dr. Barnes-Jordan on that date failed to indicate abnormalities in Plaintiff's lumbar spine but showed "minor degenerative changes" in her knees. R. 636, 720–21. On February 5,

---

[9]  R. 659, 653, 648, 639–40, 634, 636, 715.

[10]  R. 648–49, 639, 634, 715.

[11]  R. 648–49, 639–40, 634, 636, 715–16.

[12]  R. 639–40, 634, 636, 715.

[13]  R. 634, 636, 715.

[14]  "Myalgia" means "muscular pain." Stedman's Medical Dictionary 581020, Westlaw (database updated Nov. 2014).

2014, Dr. Barnes-Jordan injected lidocaine into Plaintiff's left knee joint to alleviate her pain. R. 716.

### 3. Plaintiff's Testimony

At the hearing, Plaintiff testified that Dr. Barnes-Jordan was then treating her for diabetes, arthritis, depression, and fibroid tumors. R. 139. Plaintiff stated that she had been undergoing treatment for diabetes and arthritis for three to six months prior to the hearing and had been suffering from depression due to her brother's murder six or seven years prior. R. 140–41. Plaintiff also stated that she had been suffering from joint pain for "a long time, over 10 years." R. 140. She described the pain as affecting her joints generally but noted particular discomfort in her "shoulder joints, hip joint, knee joint, toe joints, [and] knuckles." R. 140. She detailed her pain as follows: "Pains are sharp; I have muscle spasms in my back; in my lower legs; I also catch them in my feet . . . it feels like my toes are curling upward." R. 142. Plaintiff stated that she has trouble sleeping at night; she "wake[s] in discomfort from the muscle spasms, the pain" and also has trouble breathing. R. 142.

Plaintiff testified that she uses a cane, which a doctor prescribed to her. R. 146. She described herself as walking "kind of slowly" and stated that, with her cane, she was able to walk from the parking lot to the building where the hearing was held, but then had to rest. R. 147. She cannot climb a flight of stairs. R. 147. Plaintiff said that she has problems sitting throughout the day due to severe back pain, which requires her to constantly shift position. R. 147. As she put it: "when I sit, I tend to hurt my back, my joints, especially this right side. And I don't know how long I could do that." R. 148. Plaintiff testified that she has difficulty bathing and getting in and out of the bathtub and needs help getting dressed. R. 143. She stated that, on an average day, her daughter helps her get dressed and prepares her meals, R. 143. Plaintiff rests about four to eight

hours per day, R. 146. She sometimes reads or watches television, but otherwise does not "do too much." R. 144, 146. Plaintiff does not cook, do laundry, vacuum, mop, take out the garbage, go grocery shopping, or exercise. R. 144–45. Plaintiff stated that she has tried to wash dishes and cook but has difficulty standing or sitting for long periods of time, has to constantly adjust her body, and "wind[s] up dizzy" when she tries to stand. R. 144. She drives a vehicle twice a week, but "[o]nly when [she] ha[s] to because [she] fell asleep behind the wheel." R. 145.

At the hearing, Plaintiff stated she was taking metformin for diabetes, R. 140, and hydrocodone (a narcotic) every 12 hours for pain, R. 154. A list provided to the ALJ at the hearing shows that Plaintiff was also taking the following medications: losartan for high blood pressure; gabapentin and tramadol for pain; furosemide for fluid build-up; sertraline for depression; meloxicam for arthritis; potassium and iron supplements; and a laxative. R. 127, 309–11. Plaintiff stated that the medication helped with her pain but did not relieve it completely. R. 154.

### 4. Assessments of Plaintiff's Physical Abilities/Impairments

Plaintiff underwent a consultative physical examination on October 11, 2012. R. 511–18. The resulting report stated that Plaintiff had: no joint swelling but exhibited tenderness in her right paracervical muscles and right shoulder region; weakness in her right upper extremity; a normal range of motion in her left upper and lower extremity; "mild weakness" in her upper and lower extremity; and normal range of motion and strength in both knees. R. 513. The report further observed that Plaintiff was unable to squat or walk on her heels or toes, but able to rise from the sitting position and "get up and down from the exam table with some difficulty"; and that, while "able to maneuver about the exam room without the use of" her cane, Plaintiff needed the cane for "longer distances and uneven terrain." *Id.* Plaintiff's muscle strength was assessed as

5/5 for "all muscle tested," except that her "right upper and lower was 4/5" and her grip strength was "reduced on the right." R. 514. The "clinical impression" section included the following conditions: "chronic cervical and lumbar pain with radiculopathy secondary to multiple traumas"; "right-sided weakness/history of multiple trauma events with resultant radiculopathy with muscle weakness right upper and lower extremity"; and obesity. R. 514.

The record also contains an eight-page form entitled "Physical Residual Functional Capacity Assessment." R. 519–26. It is dated November 28, 2012 and signed by Dr. Shabnam Rehman, M.D., who is identified as a medical consultant. R. 526. The form states that Plaintiff can occasionally lift and/or carry a maximum of 20 pounds; frequently lift and/or carry a maximum of 10 pounds; stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; and that her ability to push and/or pull is "unlimited," subject to the "lift and/or carry" limitations. R. 520.

On January 30, 2014, Dr. Barnes-Jordan completed a form entitled "Medical Assessment of Ability To Do Work-Related Activities (Physical)," in which she reported:

- Plaintiff's lifting/carrying ability is limited to a maximum of 10–15 pounds, both occasionally and frequently, due to "upper extremity weakness, decrease [*sic*] ROM [i.e., range of motion], lower back pain, [and] chronic knee pain bilaterally." R. 702.

- Plaintiff's ability to stand and/or walk is limited to 3–4 hours in an 8-hour day, both in total and without interruption, due to "chronic lower back pain" and "bilateral knee pain." R. 702.

- Plaintiff's ability to sit is limited to 3–4 hours in an 8-hour day, both in total and without interruption, due to "chronic lower back pain." R. 702.

8

- Plaintiff is "never" able to climb, kneel, crouch, stoop, or crawl, but she can "frequently" balance. R. 703.

- Plaintiff's reaching, handling, and push/pulling abilities are impaired due to "decreased range of motion (ROM) of shoulders and antalgic gait" resulting from "chronic pain including lower back, shoulders, and knees." Plaintiff's feeling, seeing, hearing, and speaking functions, however, are not affected by these impairments. R. 703.

- Plaintiff's impairments cause "environmental restrictions" related to heights, moving machinery, temperature extremes, and vibration. Plaintiff "cannot climb to any height level or move machinery," and "extreme weather can worsen joint pain." Dr. Barnes-Jordan noted that the medical findings supporting this assessment were "decreased ROM of knees, hips, back and shoulder." R. 703.

Dr. Barnes-Jordan concluded the report by reiterating that Plaintiff "has difficulty with sitting/standing for long periods of time due to back and knee pain" and that she "cannot lift heavy objects due to upper extremity weakness." R. 703.

In a questionnaire dated February 3, 2014, Dr. Barnes-Jordan wrote that:

- Plaintiff's physical therapy has aggravated her condition, not reversed it. R. 706.

- Plaintiff's x-rays were "unremarkable" but that Plaintiff "complains of chronic pain." R. 706.

- Plaintiff "shows moderate to severe pain and reports that pain has been chronic and consistent since prior accidents despite therapy." R. 706.

- Plaintiff's complaints of pain are credible, based on reasonable medical evidence. R. 706.

- Plaintiff "has pain with range of motion flexion/extension of back and knees which are not consistent with x-ray." R. 707.

9

- ▪ Plaintiff has a limited range of motion in moving from the vertical position; has weakness in her back and difficulty lifting more than 15 pounds; has no ability to squat due to knee pain; has a limited ability to walk on heels or toes due to back pain; experiences pain when rotating her right shoulder; experiences right hip pain and a decreased range of motion when raising or lowering legs in a standing position; has "significant motor loss" in her right shoulder, right hip, and back flexion; and has a "slowed gait assisted with cane." R. 707–08.

- ▪ Plaintiff's pain medications "would be expected to interfere" with her coordination, concentration, and ability to remain awake and alert. R. 709.

Dr. Barnes-Jordan also stated that she did not believe Plaintiff "can perform in competitive gainful employment in a forty hour work week situation." R. 709.

## C.  The ALJ's Findings and Conclusions

The ALJ's decision contains the following findings of fact and conclusions of law:

1. Plaintiff met the Act's insured status requirements through December 31, 2016. R. 110.

2. Plaintiff has not engaged in substantial gainful activity since March 2, 2012, the alleged onset date of her disability. *Id.*

3. Plaintiff has the following severe impairments: morbid obesity and chronic pain syndrome with pain involving the neck, back, and knees. *Id.*

4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. 115.

5. Plaintiff has the residual functional capacity to perform the full range of light work as defined in 20 C.F.R. § 404.1567(b). Specifically, Plaintiff can stand and/or walk about

six hours in an eight-hour workday. She can sit at least six hours in an eight-hour workday. She can lift and/or carry 20 pounds occasionally and 10 pounds frequently. Pushing and/or pulling are likewise limited to 20 pounds occasionally and 10 pounds frequently. R. 116.

6.  Plaintiff is unable to perform any past relevant work. R. 118.

7.  On the alleged disability onset date, Plaintiff was 44 years old, which is "a younger individual age 18–49." *Id.*

8.  Plaintiff has at least a high school education and is able to communicate in English. *Id.*

9.  Transferability of job skills is not an issue in this case because Plaintiff's past relevant work is unskilled. *Id.*

10. Considering Plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. *Id.*

11. Plaintiff has not been under a disability, as defined in the Act, from March 2, 2012, through July 2, 2014 (the date of the ALJ's decision). *Id.*

## II.  LEGAL STANDARDS

### A.  Summary Judgment

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (internal quotation marks and citation omitted). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Quality*

*InfusionCare, Inc. v. Health Care Serv. Corp.*, 628 F.3d 725, 728 (5th Cir. 2010) (internal quotation marks and citation omitted).

## B. Standard of Review

The Act provides that "any individual" may seek district court review of "any final decision of the Commissioner of Social Security made after a hearing to which he was a party." 42 U.S.C. § 405(g). In performing that review:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner . . . , with or without remanding the cause for a rehearing. The findings of the Commission . . . as to any facts, if supported by substantial evidence, shall be conclusive . . . .

*Id.* Judicial review of the Commissioner's decision denying benefits is thus limited to determining whether that decision is supported by substantial evidence and whether the proper legal standards were applied. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). "Substantial evidence" means "that quantum of relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000). It is "something more than a scintilla but less than a preponderance." *Id.* A reviewing court may not reweigh the evidence in the record, nor try the issues *de novo*, nor substitute its judgment for that of the Commissioner, even if the evidence preponderates against the Commissioner's decision. *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999). Conflicts in the evidence are for the Commissioner, not the courts, to resolve. *Id.* Even so, judicial review must not be "so obsequious as to be meaningless." *Id.* (internal quotation marks and citation omitted). The "substantial evidence" standard is not a rubber stamp for the Commissioner's decision; it involves more than a search for evidence supporting the Commissioner's findings. *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985); *Singletary v. Brown*, 798 F.2d 818, 822–223 (5th Cir. 1986) ("[T]he

substantial evidence test does not involve a simple search of the record for isolated bits of evidence which support the [Commissioner's] decision."). Rather, a reviewing court must scrutinize the record as a whole, taking into account whatever in the record fairly detracts from its weight. *Id.* A court "may affirm only on the grounds that the Commissioner stated for [the] decision." *Copeland v. Colvin*, 771 F.3d 920, 923 (5th Cir. 2014).

## III.  DISCUSSION

Plaintiff argues that the ALJ erred in his decision by failing to consider (1) all the evidence in the record, particularly certain evidence Plaintiff's treating physician supplied, and (2) evidence related to the side effects of Plaintiff's medications. Pl.'s Mot. Summ. J. 5–12, ECF No. 9. The Commissioner responds that (1) the ALJ properly considered the treating physician's records, and (2) the ALJ was under no obligation to consider medication side effects because there was no evidence in the record that Plaintiff actually experienced any. Def.'s Summ. J. Br. 4–7, ECF No. 11.

### A.  The ALJ's Decision

#### 1.  The ALJ's Disability Determination

To be entitled to Social Security disability insurance benefits, a claimant must demonstrate that she is "disabled" under the Act. *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005). A claimant is disabled if she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). As the ALJ stated in his decision, R. 108–10, the Commissioner uses a five-step inquiry to determine whether a claimant is disabled, asking, in sequence:

(1)     whether the claimant is presently engaged in substantial gainful activity (Step One);

13

(2)     whether the claimant has a severe impairment (Step Two);

(3)     whether the claimant's impairment meets or equals the severity of an impairment listed in Appendix 1 of the applicable regulations (Step Three);

(4)     whether the impairment prevents the claimant from performing past relevant work (Step Four); and

(5)     whether the impairment prevents the claimant from performing any other work (Step Five).

*Perez*, 415 F.3d at 461. The claimant bears the burden of proof on the first four steps of this inquiry. *Id*. At Step Five, the burden shifts to the Commissioner to show that the claimant can perform other substantial work in the national economy; if the Commissioner makes that showing, the burden shifts back to the claimant to rebut that finding. *Id.* Before moving from Step Three to Step Four, the Commissioner assesses the claimant's "residual functional capacity" ("RFC"). *Id*. The RFC assessment entails a determination, based on all relevant evidence in the record, of the most the claimant can still do despite her physical and mental limitations. *Id.* at 462. The Commissioner uses the claimant's RFC at Step Four to determine whether the claimant can still do her past relevant work, and at Step Five to determine whether the claimant can adjust to any other type of work. *Id.*

In this case, the ALJ found, at Step One, that Plaintiff had not engaged in substantial gainful activity since March 2, 2012. R. 110. At Step Two, the ALJ found that Plaintiff has two severe impairments: morbid obesity and "chronic pain syndrome with pain involving the neck, back, and knees." *Id.* At Step Three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that meets or equals the severity of an impairment listed in Appendix 1 of the pertinent regulations. R. 115. At the RFC assessment stage, the ALJ found that Plaintiff "has the residual functional capacity to perform the full range of light work as

14

defined in 20 C.F.R. § 404.1567(b)." R. 116. At Step Four, the ALJ found Plaintiff unable to perform any past relevant work because the exertional demands of her prior job as a health provider exceeded her RFC. R. 117–18. Finally, at Step Five, the ALJ found, based on Plaintiff's RFC, age, education, and work experience, that Plaintiff was able to do other work and thus was not "disabled" under the Act. R. 118.

### 2. The ALJ's RFC Assessment

Here, Plaintiff challenges the ALJ's assessment of her RFC. *See* Pl.'s Mot. Summ. J. 10. In assessing Plaintiff's RFC, the ALJ relied upon Social Security Ruling ("SSR") 96–7p, 1996 WL 374186 (July 2, 1996). R. 116.[15] SSR 96–7p states that, under the regulations promulgated by the Social Security Administration, an RFC assessment entails "a two-step process for evaluating symptoms, such as pain, fatigue, shortness of breath, weakness, or nervousness." 1996 WL 374186, at *2; *see also Newbauer v. Astrue*, No. 1:10-cv-260, 2012 WL 3727603, at *1 (S.D. Tex. Aug. 27, 2012) (Hanen, J.).

First, an ALJ must consider whether the claimant has "an underlying medically determinable physical or mental impairment(s)—i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the [claimant]'s pain or other symptoms." SSR 96–7p, 1996 WL 374186, at *2. In making this determination, the Commissioner must also "consider all of [the claimant]'s medically determinable impairments," including those that are not "severe." *Id.*

---

[15]   Effective March 28, 2016, SSR 96–7p was superseded by SSR 16–3p, 2016 WL 1119029 (Mar. 16, 2016), *corrected*, 2016 WL 1237954 (Mar. 24, 2016). SSR 16–3p clarifies the process for evaluating impairment-related symptoms under the Act and, in particular, eliminates the term "credibility" from the sub-regulatory policy reflected in SSR 96–7p. 2016 WL 1119029, at *1–2. "District courts are divided on the issue of whether SSR 16–3p should apply retroactively," *Whitaker v. Colvin*, No. 4:15-cv-2204, 2017 WL 896160, at *21 (S.D. Tex. Feb. 15, 2017) (Johnson, J.), *adopted*, 2017 WL 879847 (S.D. Tex. Mar. 6, 2017) (Miller, J.), and the Fifth Circuit has not ruled on the question. The parties have not raised or briefed the issue of SSR 16–3p's retroactivity. Because it does not appear that SSR 16–3p would change the conclusion that remand is necessary in this case, the Court will not examine the issue at this time.

§ 404.1545(a)(2). A claimant's "statements alone are not enough to establish that there is a physical or mental impairment." *Id.* § 404.1528(a). When a claimant has "a severe impairment(s), but [her] symptoms, signs, and laboratory findings do not meet or equal those of a listed impairment in appendix 1 of [the regulations]," the Commissioner "will consider the limiting effects of all [the claimant's] impairment(s), even those that are not severe," based on "all of the medical and nonmedical evidence." *Id.* § 404.1545(e).

If the ALJ finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, he proceeds to the second part of the inquiry, which requires him to "evaluate the intensity, persistence, and limiting effects of the [claimant]'s symptoms to determine the extent to which the symptoms limit the [claimant]'s ability to do basic work activities." SSR 96–7p, 1996 WL 374186, at *2; *accord* 20 C.F.R. § 404.1529(c)(1). If the claimant's description of the intensity, persistence, or limiting effects of pain or other symptoms is not substantiated by "objective medical evidence," the ALJ must make a finding on the credibility of the claimant's statements based on a consideration of the entire case record. SSR 96–7p, 1996 WL 374186, at *2. "It is not necessary that the claimed severity [of the symptoms] be proved by objective medical evidence." *Mayberry v. Colvin*, No. 3:15-cv-330, 2016 WL 7686850, at *4 (S.D. Tex. Nov. 28, 2016) (Froeschner, J.), *adopted*, 2017 WL 86880 (S.D. Tex. Jan. 10, 2017) (Hanks, J.). However, "[t]he claimant's subjective complaints of symptoms need not be accepted to the extent they are inconsistent with the available evidence, including the objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain alleged by the claimant." *Id.* When weighing a claimant's statements about the limiting effects of her symptoms, the ALJ must consider all relevant evidence, including medical signs and laboratory findings, as well as the

opinions of treating and non-treating medical sources, objective medical evidence, and other factors relevant to the claimant's symptoms, such as daily activities; location, duration, frequency and intensity of pain and other symptoms; and measures taken (such as medication, treatment or home remedies) to alleviate those symptoms. *Id.*; 20 C.F.R. § 404.1529(a), (c)(1)–(4); *see also* 20 C.F.R. § 404.1545(a)(1), (3) (requiring the Commissioner to consider "all of the relevant medical and other evidence" in assessing a claimant's RFC, including "any statements about what [the claimant] can still do that have been provided by medical sources, whether or not they are based on formal medical examinations," as well as "descriptions and observations of [the claimant's] limitations from [her] impairment(s), including limitations that result from [her] symptoms, such as pain, provided by [the claimant], [the claimaint's] family, neighbors, friends, or other persons.").

Here, the ALJ found favorably for Plaintiff at the first step, concluding that her "medically determinable impairments could reasonably be expected to cause the alleged symptoms." R. 116. At the second step, however, the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." *Id.* The ALJ explained:

> In terms of the claimant's alleged physical impairments, the undersigned finds that the intensity and persistence of the claimant's pain is neither consistent with the medical record signs and laboratory findings nor is the intensity and persistence of the reported pain consistent with the medical record as a whole. As noted above diagnostic imaging studies are within normal limits with the exception of x-ray imaging of the bilateral knees which showed only minor degenerative changes as recently as January 2014 (Exhibits 1F-8, 3F-70, 18F-10 and 18F-11). Consultative examination physical findings were normal with normal muscle strength (5/5) with the exception of the right upper and right lower extremity (4/5), but the undersigned notes that 4/5 strength is still considered good, with 5/5 considered excellent strength (Exhibit 5F-5). The claimant's treating physician progress notes are somewhat inconsistent in describing the claimant's pain complaints, noting multiple subjective pain complaints but also noting negative for back pain and myalgias (*See generally* Exhibits 14F and 18F).

17

> While the undersigned has considered Dr. Barnes Jordan's statements as detailed above at Exhibits 16F and 17F, the undersigned notes that Dr. Barnes Jordan also noted the claimant's pain complaints were not consistent with x-ray imaging which was generally unremarkable (Exhibit 17F). Moreover, the statements of Dr. Barnes Jordan appear contrary to the evidence as a whole, and therefore the treating source statements are given little weight (Exhibits 4F-45 and 5F).
>
> As for the opinion evidence, the state agency medical examiners were of the opinion that the claimant retained the residual functional capacity to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk (with normal breaks) for a total of 6 hours in an 8-hour workday, sit with normal breaks for about 6 hours in an 8-hour workday, and was unlimited in the ability to push and/or pull except by limits for lifting and carrying (i.e. 20 pounds occasionally and 10 pounds frequently). Additionally, the state agency medical reviewers were of the opinion that the claimant could occasionally climb ramps and stairs, but could never climb ladder, rope, or scaffolds. The claimant could occasionally stoop, crouch, and crawl, and frequently balance and kneel (Exhibit 6F). Overall, the undersigned finds no additional medical findings in the medical record contrary to the limitations addressed by the state agency medical examiners. Accordingly, this opinion is given great weight.

R. 117. Based on the vocational expert's testimony, the ALJ concluded that "such a residual functional capacity was consistent with a full range of light work activity." *Id.*

## B.  Substantial Evidence Does Not Support the ALJ's Assessment of Plaintiff's RFC

The Court concludes that this case must be remanded to the Commissioner because the ALJ failed to fully consider record evidence of Dr. Barnes-Jordan's treatment of Plaintiff. In assessing Plaintiff's RFC, the ALJ described the medical records from Plaintiff's visits to Dr. Barnes-Jordan as being "somewhat inconsistent in describing [Plaintiff]'s pain complaints, noting multiple subjective pain complaints but also noting negative for back pain and myalgias." R. 117. In actual fact, those records show that, from July 31, 2013 through February 2014, Dr. Barnes-Jordan regularly assessed Plaintiff as having pain in various parts of her body. Dr. Barnes-Jordan's records did not show that Plaintiff was suffering from the exact same pain symptoms on every visit; however, some type of pain was always noted, and Plaintiff's symptoms were described as being subject to episodic flare-ups and exhibiting "progressive

worsening." R. 661, 633. The ALJ did not discuss the fact that Dr. Barnes-Jordan noted Plaintiff as having back pain on several occasions or that her back pain might have been subject to episodic flare-ups. Nor did the ALJ explain how the absence of myalgia was "inconsistent" with the various positive findings for other types of pain. Given the diffuse nature of Plaintiff's pain symptoms and their overall persistence over time, the ALJ's singling out of "back pain and myalgias" as a basis for discounting Dr. Barnes-Jordan's notes as a whole constitutes impermissible picking-and-choosing among record evidence. *See Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) ("[T]he ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position."); *Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001) (ALJ "failed to consider the evidence carefully" where he selectively cited record evidence).

The ALJ also gave "little weight" to Dr. Barnes-Jordan's "statements as detailed above at Exhibits 16F and 17F." Exhibit 16F is Dr. Barnes-Jordan's January 30, 2014 report concerning Plaintiff's ability to do work-related physical activities, R. 702–03; Exhibit 17F is the questionnaire Dr. Barnes-Jordan completed on February 3, 2014, R. 706–10. By referencing the "statements as detailed above," the ALJ was apparently referring back to his Step Two analysis, where he wrote the following:

> On January 30, 2014 Dr. Barnes Jordan completed a form assessment of the claimant's ability to do work related activities (Exhibit 16F). Dr. Barnes Jordan indicated that the claimant could frequently lift and carry 10-15 pounds limited due to upper extremity weakness, decreased range of motion, low back pain, and chronic knee pain bilaterally. Standing and walking in an 8-hour day was reported as three to four hours total and without interruption, again due to chronic low back and bilateral knee pain. Sitting was likewise limited to 3-4 hours total and without interruption due to chronic low back pain. Dr. Barnes Jordan was of the opinion that the claimant should never climb, kneel, crouch, stoop, or crawl, but could frequently balance. Reaching, handling, pushing and pulling were also reported affected by low back pain, shoulder, and knee pain. Dr. Barnes Jordan recommended avoidance of heights, moving machinery, temperature extremes,

and vibration. Finally, Dr. Barnes Jordan commented that the claimant had difficulty with sitting/standing for long periods of time due to back and knee pain and could not lift heavy objects due to upper extremity weakness (Exhibit 16F). In response to interrogatories provided by the claimant's attorney representative, Dr. Barnes Jordan noted that conservative treatment such as physical therapy aggravated the claimant's condition in the past, and that surgical intervention was not recommended. Furthermore, Dr. Barnes Jordan noted unremarkable x-ray findings but persistent chronic pain complaints. Dr. Barnes Jordan also noted pain with range of motion, flexion/extension of the back and knees which were not consistent with x-ray findings (Exhibit 17F, pp. 3-4). Straight leg raising tests were reported negative, but decreased range of motion of the back and hip were reported (Exhibit 17F-5). Finally, Dr. Barnes Jordan indicated that she did not believe the claimant could perform in competitive gainful employment in a forty hour workweek situation (Exhibit 17F-6).

R. 111–12.

At this point, it bears emphasizing that Dr. Barnes-Jordan was Plaintiff's treating physician and was therefore "familiar with [Plaintiff]'s impairments, treatments and responses." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). Under the "treating physician rule," an ALJ is required to give "controlling weight" to a "treating physician's opinion on the nature and severity of a patient's impairment," provided that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not inconsistent with other substantial evidence." *Id.* (internal quotation marks and citation omitted) (quoting *Martinez v. Chafer*, 64 F.3d 172, 175–76 (5th Cir. 1995)); *accord* 20 C.F.R. § 404.1527(c)(2). However, an ALJ may assign a treating physician's opinions "little or no weight when good cause is shown." *Id.* at 455–56. "Good cause" exists when the "treating physician's evidence is conclusory, is unsupported by medically accepted clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence." *Id.* at 456 (citations omitted). When an ALJ does not give a treating physician's opinion controlling weight, regulations require him to consider the following factors in deciding how much weight to give the opinion: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment

relationship; (3) the extent to which the physician presents relevant evidence and a thorough explanation to support the opinion; (4) the degree to which the opinion is consistent with the record as a whole; (5) the specialization of the treating physician; and (6) other factors, such as the physician's understanding of the disability review process and familiarity with other information in the case record. 20 C.F.R. § 404.1527(c)(2)(i)–(ii), (c)(3)–(6); *see also Newton*, 209 F.3d at 456 (remanding case because the ALJ failed to consider relevant factors before declining to give any weight to the treating physician's opinion).

Here, the reasons the ALJ gave for affording "little weight" to Dr. Barnes-Jordan's opinions do not withstand scrutiny.[16] First, the ALJ relied on Dr. Barnes-Jordan's own observation that (as the ALJ framed it) Plaintiff's "pain complaints were not consistent with x-ray imaging which was generally unremarkable." Importantly, the ALJ did not rely on any inconsistency between Dr. Barnes-Jordan's opinion and the x-rays; instead, he relied on the fact that Dr. Barnes-Jordan herself observed that the x-rays were "unremarkable." But it is not at all clear how that observation, in itself, supports giving Dr. Barnes-Jordan's opinions diminished weight. If anything, that observation shows that Dr. Barnes-Jordan considered contrary evidence and thus tends to add weight to her overall assessment of Plaintiff's condition and physical abilities, particularly since, as Plaintiff's treating physician, she was very familiar with Plaintiff's conditions and medical history. *See* 20 C.F.R. § 404.1527(c)(3) (listing "the degree to which [an opinion] considers all of the pertinent evidence" as a relevant factor in deciding what weight to give that opinion). The ALJ's explanation on this point is inadequate and again suggests impermissible picking-and-choosing among the record evidence.

---

[16] Because Dr. Barnes-Jordan's opinion that Plaintiff cannot "perform in competitive gainful employment in a forty hour work week situation," R. 709, concerned an "issue reserved to the Commissioner," it was not entitled to "any special significance." 20 C.F.R. § 404.1527(d). Still, the ALJ was required to fully consider that opinion. *Id.*

As the second reason for giving them "little weight," the ALJ wrote that Dr. Barnes-Jordan's "statements . . . appear[ed] contrary to the evidence as a whole." Inasmuch as the ALJ failed to fully consider the progress notes Dr. Barnes-Jordan compiled between July 2013 and February 2014, his finding that Dr. Barnes-Jordan's statements were contrary to "the evidence as a whole" is not supported by substantial evidence: Dr. Barnes-Jordan's notes are part of the "evidence as a whole" and tend to support her opinions.

The ALJ followed his reference to the "evidence as a whole" with a citation to Exhibit 4F-45 (a page from the August 8, 2012 consultative physical examination) and Exhibit 5F (the October 11, 2012 RFC assessment), but he did not articulate how those assessments supposedly contradicted the assessments Dr. Barnes-Jordan made in 2014. Nor is an adequate explanation apparent from the record. For example, Exhibit 4F-45 states that Plaintiff had a "normal range of motion" but also states that Plaintiff was positive for back pain. R. 461. As already noted, the ALJ relied on Plaintiff's history of back pain as a reason for discounting Dr. Barnes-Jordan's medical reports; why that would not also diminish the weight he afforded the August 2012 consultative physical examination, which was not even performed by Plaintiff's treating physician, is questionable at best. In addition, more than a year had passed between the 2012 assessments and those made by Dr. Barnes-Jordan in 2014. The ALJ provided no rationale for apparently giving more weight to the earlier assessments than to the later ones, which were made by a treating physician who was more familiar with Plaintiff and who had assessed Plaintiff's condition as "progressively worsening." *See Champion v. Barnhart*, 36 F. App'x 921 (9th Cir. 2002) (unpublished opinion) ("The ALJ's selective reliance on the treating physician's earlier opinion is not supported by the record."); *Collins v. Colvin*, No. 12CV1021 EJM, 2013 WL 833539, at *1 (N.D. Iowa Mar. 6, 2013) ("The ALJ erred in discounting the long term treating

physician's more recent views based upon inconsistencies with earlier views and treatment notes, in light of the treating physician's observation as to plaintiff's apparent worsening condition."); *Balodis v. Leavitt*, 704 F. Supp. 2d 255, 266 (E.D.N.Y. 2010) ("The ALJ provided no analysis regarding the possibility that plaintiff's condition deteriorated in the significant gap in time between the doctors' opinions. When there is such a lengthy time period between opinions, the ALJ must explain his decision to choose the earlier opinion over the more recent opinion where deterioration of a claimant's condition is possible."); *Huhta v. Barnhart,* 328 F. Supp. 2d 377, 386 (W.D.N.Y. 2004) (reversing ALJ's decision where ALJ relied on opinion of a non-examining and non-treating physician who "gave his opinion almost two years earlier . . . , and plaintiff's medical condition had substantially deteriorated since then.").

An ALJ's "decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96–2p, 61 Fed. Reg. 34490-01 (July 2, 1996); *see also Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001); *Loza*, 219 F.3d at 395 (concluding that "[n]o good cause appears in the ALJ opinion or in the record to justify the ALJ's failure to give 'considerable weight' to the treating doctors' medical evidence"); *Newton*, 209 F.3d at 456. Here, the ALJ's stated rationale, when considered in conjunction with the record, is too inadequate for the Court to affirm giving Dr. Barnes-Jordan's records and opinions such short shrift.

Lastly, it is not clear that the ALJ considered all of Plaintiff's relevant symptoms. He stated he did, R. 116, but the only symptom specifically referred to in the RFC assessment is Plaintiff's pain complaints. Nowhere in his discussion of Plaintiff's RFC did the ALJ refer to

other symptoms evidenced in the record, such as Plaintiff's fatigue and weakness. Compounding the difficulty of interpreting the ALJ's decision on this point is the fact that he did not identify which "medically determinable impairments" he considered when evaluating the related symptoms for RFC purposes. Presumably, he meant to include, at a minimum, the two "severe impairments" he found at Step Two—i.e., morbid obesity and "chronic pain syndrome with pain involving the neck, back, and knees." But in the RFC assessment, all medically determinable impairments, not just those that are "severe," must be considered, not only on their own but also in combination with one another. *See* 20 C.F.R. § 404.1545(a)(2), (e).

An ALJ is not required to discuss each and every piece of evidence in the record, *see Castillo v. Barnhart*, 151 F. App'x 334, 335 (5th Cir. 2005) (unpublished opinion), but, by the same token, a reviewing court "may affirm only on the grounds that the Commissioner stated for [the] decision." *Copeland v. Colvin*, 771 F.3d 920, 923 (5th Cir. 2014); *accord Parrish v. Berryhill*, No. 4:15-cv-3717, 2017 WL 713567, at *5–6 (S.D. Tex. Feb. 21, 2017) (Stacy, J.). Here, the record does not establish that the ALJ considered all of the relevant evidence in assessing Plaintiff's RFC,[17] and, given the infirmities in the ALJ's stated reasons for his decision, the Court cannot say that "substantial evidence" supports denying Plaintiff's

---

[17]   In a letter to the Court, Plaintiff also argues that the Appeals Council erred by failing to consider her diagnosis of fibromyalgia, which a doctor made after the ALJ's decision but before the Appeals Council denied her appeal. In denying Plaintiff's appeal, the Appeals Council stated that the ALJ "decided your case through July 2, 2014. This new information is about a later time. Therefore, it does not affect the decision about whether you were disabled beginning on or before July 2, 2014. If you want us to consider whether you were disabled after July 2,2014, you need to apply again." R. 2.

   "If additional evidence is presented while the case is pending review by the Appeals Council, courts . . . customarily review the record as a whole, including the new evidence, in order to determine whether the Commissioner's findings are still supported by substantial evidence." *Higginbotham v. Barnhart*, 163 F. App'x 279, 281 (5th Cir. 2006) (unpublished opinion). The Court has examined the evidence relating to Plaintiff's fibromyalgia diagnosis. Because nothing in the cited records shows that Plaintiff suffered from fibromyalgia on or before the date of the ALJ's decision, *see* R. 92–104, the Court cannot say that the Commissioner erred. That said, the Court expresses no opinion on what, if any, effect Plaintiff's fibromyalgia diagnosis may have in this case on remand. *See Allord v. Barnhart*, 455 F.3d 818, 822 (7th Cir. 2006) (holding that retrospective diagnosis of an impairment can support a finding of past impairment).

application for disability insurance benefits. Since full consideration of the evidence might have resulted in a favorable decision for Plaintiff, the case must be remanded.

## C.  The ALJ Failed to Consider the Side Effects of Plaintiff's Medications

Plaintiff maintains that the ALJ also erred because he failed to consider the side effects of Plaintiff's medications in making his RFC assessment. "[I]f an individual's medical treatment [which would include drug therapy] significantly interrupts the ability to perform a normal, eight-hour work day, then the ALJ must determine whether the effect of treatment precludes the claimant from engaging in gainful activity." *McNeil v. Astrue*, No. 4:07-cv-3664, 2009 WL 890553, at *12 (S.D. Tex. Mar. 31, 2009) (Milloy, J.) (internal quotation marks and citations omitted; brackets in original), *adopted,* 2009 WL 1451707 (S.D. Tex. May 22, 2009) (Rosenthal, J.). Moreover, regulations require the Commissioner to consider the "'type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate [her] pain or other symptoms.'" *Crowley v. Apfel,* 197 F.3d 194, 199 (5th Cir. 1999) (quoting 20 C.F.R. § 404.1529(c)(3)(iv)). In this case, the ALJ did not discuss any medication side effects in connection with his assessment of Plaintiff's RFC. Yet evidence in the record showed that Plaintiff was taking numerous medications, including several for pain, R. 127, 154, 309–11. Just prior to the hearing, Dr. Barnes-Jordan affirmed that Plaintiff's pain medications "would . . . be expected to interfere" with her coordination, concentration, and "ability to remain awake and alert." R. 709. Moreover, Plaintiff had previously indicated that her "medicines cause side effects," R. 269, specifying that "one of my medicines causes problems with my memory," R. 267. She also testified that she had fallen asleep while driving. R. 145.

The Commissioner suggests that the ALJ had no duty to consider this evidence because it does not specifically show that any particular medication(s) actually caused Plaintiff to

experience side effects. However, an ALJ has a duty to "develop the facts fully and fairly relating to an applicant's claim for disability benefits." *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995). If the ALJ "fails in that duty, he does not have before him sufficient facts on which to make an informed decision. Consequently, his decision is not supported by substantial evidence." *Pierre v. Sullivan*, 884 F.2d 799, 802 (5th Cir. 1989) (per curiam) (citing *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984)). Here, the evidence before the ALJ was sufficient to require him to at least "solicit additional evidence or any explanations regarding the possible side effects of these medications." *McNeil*, 2009 WL 890553, at *13. Because "a different result might have been reached had the ALJ explored further how the side effects of [Plaintiff]'s medications, alone or in combination with each other and with her impairments, might impede her residual functional capacity . . . , she has been prejudiced by the ALJ's error, and remand is warranted." *Id.* (citations omitted).

## D.  On Remand, the Case Must Be Assigned to a Different ALJ

Section 405(g) of the Act "grants courts wide discretion to dispose of matters 'with or without remanding the cause for a rehearing.'" *Bordelon v. Barnhart*, 161 F. App'x 348, 352 n.12 (5th Cir. 2005) (unpublished opinion) (quoting 42 U.S.C. § 405(g)). The Fifth Circuit has held that, in ordering a case remanded to the Commissioner, it is within the reviewing court's discretion whether to also require that the case be assigned to a different ALJ. *See id.* n.12; *Davis v. Apfel*, 234 F.3d 706 (5th Cir. 2000) (per curiam) (unpublished opinion). While the Fifth Circuit has not formulated a test to guide this decision in cases involving remand to the Commissioner, the Court takes guidance from cases in which the Fifth Circuit has considered whether to reassign a case to a different district judge on remand. In those cases, the Fifth Circuit applies two tests. *Latiolais v. Cravins*, 574 F. App'x 429, 436 (5th Cir. 2014) (unpublished

26

opinion) (refusing to choose between the two tests). Under the "more stringent" test, if there is no evidence that the district judge had a personal bias, the remand decision turns on consideration of the following three factors:

> (1) whether the original judge would reasonably be expected upon remand to have substantial difficulty in putting out of his or her mind previously-expressed views or findings determined to be erroneous or based on evidence that must be rejected, (2) whether reassignment is advisable to preserve the appearance of justice, and (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*Id.* (citations omitted). Under the "more lenient" test, reassignment is appropriate when "the facts might reasonably cause an objective observer to question the original judge's impartiality." *Id.* (internal quotation marks, brackets, and citations omitted).

It makes sense to apply these tests in the present context because both are consistent with pertinent regulations of the Social Security Administration and the importance of ensuring a fair hearing before an ALJ. *See* 20 C.F.R. § 404.940 ("An administrative law judge shall not conduct a hearing if he or she is prejudiced or partial with respect to any party . . . ."); *Ventura v. Shalala*, 55 F.3d 900, 902 (3d Cir. 1995) (recognizing that "[t]he right to an unbiased ALJ is particularly important because of the active role played by ALJs in social security cases").

Having reviewed the record in this case, the Court is satisfied that, even under the "more stringent" test, this case must be reassigned to a different ALJ on remand. Toward the very end of the hearing, the following exchange occurred between the ALJ and Plaintiff:

| **ALJ:** | Okay. All right. I see you've lost about 20 pounds? Is that right? Oh no, I misread that. Never mind. |
|---|---|
| **Plaintiff:** | I'm up and down on that, sir. Yes, it was 20. But to my fluid level, I do take fluid tablets. And I retain a lot of fluid. So that's a— |
| **ALJ:** | I assume your doctors told you what's causing you, right? |
| **Plaintiff:** | —salt. |

| | |
|---|---|
| **ALJ:** | Have they told you what's probably causing that? |
| **Plaintiff:** | Salt was one of them, decrease on the sodium intake. |
| **ALJ:** | It's not just that, but it's like a, you know. I mean I'm sure he's told you, you're overweight, right? |
| **Plaintiff:** | Well yes, sir, that, too. And that's what they were working toward— |
| **ALJ:** | Because what that does, is that puts a lot of pressure on the veins—the valves and the veins. |
| **Plaintiff:** | —yes, sir. |
| **ALJ:** | And that, in turn, you know, makes the veins not work as good as sending the blood back to the heart. And then that causes swelling. |
| **Plaintiff:** | Okay. |
| **ALJ:** | So that would be a really good reason to try to lose some weight. |
| **Plaintiff:** | So—okay. |

R. 156–57.

This exchange is troubling. The ALJ had no discernible reason for asking Plaintiff whether she was aware of being overweight: she had already stated on the record that she was 5'5" tall and weighed 267 pounds, R. 145, medical records consistently assessed Plaintiff as having a body mass index consistent with obesity, and Dr. Barnes-Jordan had referred her to a nutritionist, R. 659. Viewed in the most charitable light, the ALJ's initial question about Plaintiff's weight loss may have been relevant to assessing her pain symptoms. *See Barajas v. Heckler*, 738 F.2d 641, 644 (5th Cir. 1984) (noting that weight loss may be evidence of "severe, continuous pain"). But the ALJ immediately realized he was "mistaken" about Plaintiff's weight loss. His decision to nonetheless continue the inquiry, opine on the medical significance of Plaintiff's weight, and admonish Plaintiff "to try to lose some weight" was gratuitous and

insensitive to Plaintiff's condition. *See Ventura*, 55 F.3d at 903 ("The ALJ's questioning of the claimant was coercive and intimidating, and totally irrelevant to the question of whether claimant was disabled."); *Embry v. Barnhart*, No. 02-C-3821, 2003 WL 21704425, at *1 (N.D. Ill. 2003) (reassignment appropriate where ALJ "appeared to mock [p]laintiff . . . , belittle his impairments . . . , and to dispense medical advice"); *cf. Rosa v. Bowen*, 677 F. Supp. 782, 783 (D.N.J. 1988) (describing hearing before ALJ as "shameful in its atmosphere of alternating indifference, personal musings, impatience and condescension").

A disability benefits hearing is not the place for an ALJ (who is in a position of authority) to reproach a claimant (who is not) about a condition on which the latter's disability claim is based. Such comments are corrosive to the appearance of justice, not least because of the tremendous impact that a denial of benefits is likely to have on the claimant's livelihood. *See Mathews v. Eldridge*, 424 U.S. 319, 342 (1976) (recognizing that because of "the typically modest resources of the family unit of the physically disabled worker, the hardship imposed upon the erroneously terminated disability recipient may be significant"). The claimant may "sit, and fret, and bite [her] tongue"[18] rather than offer a retort, but neither she nor an objective observer will perceive the hearing as fair.

There are also serious doubts about whether an ALJ can put objectionable views expressed by such conduct out of his mind on remand. In recent years, scientific research has confirmed that obesity is the result of a myriad of factors—including genetics, hormones, metabolism, and socioeconomic inequalities related to income, geography, and race—not within an individual's control.[19] Even when individuals successfully defy these daunting factors and

---

[18] WILLIAM SHAKESPEARE, THE SECOND PART OF KING HENRY THE SIXTH act 1, sc. 1, line 230.

[19] *E.g.*, Yofi Tirosh, *The Right to Be Fat*, 12 YALE J. HEALTH POL'Y, L. & ETHICS 264, 285 (2012) ("[D]ata increasingly indicate that hormonal factors, metabolism, and genetics are all factors that

lose a significant amount of weight, many are unable to maintain their weight loss over the long term.[20] Nonetheless, it remains an exceedingly common prejudice that weight loss is a matter of sheer willpower.[21] An ALJ should strive to avoid appearing as though he harbors implicit biases, however common they may be. *Cf. Goldberg v. Kelly*, 397 U.S. 254, 265 (1970) (recognizing nearly half a century ago that "forces not within the control of the poor contribute to their poverty").

Taken in combination with his selective consideration of the evidence, the ALJ's exchange with Plaintiff regarding her weight makes reassignment to another ALJ necessary. An objective observer would question the original ALJ's impartiality. Moreover, the original ALJ would likely have substantial difficulty in putting out of his mind his previously expressed views; reassignment would well serve the appearance of justice; and any duplication in effort would not be out of proportion to the benefits of ensuring a process that is fair in both appearance and fact.

---

predetermine one's weight and impede attempts to lose it. Long-term, significant weight loss is still a challenging enigma to science and medicine. [Researchers] found that after weight loss, brain regions associated with reward were more active than the parts associated with self-control, leading to fast regain of the lost pounds.").

[20] *E.g.*, Sandra Aamodt, *Why You Can't Lose Weight On a Diet*, N.Y. TIMES (May 6, 2016), https://www.nytimes.com/2016/05/08/opinion/sunday/why-you-cant-lose-weight-on-a-diet.html; Tara Parker-Pope, *The Fat Trap*, New York Times Magazine (Dec. 28, 2011), http://www.nytimes.com/2012/01/01/magazine/tara-parker-pope-fat-trap.html.

[21] Gina Kolata, *Americans Blame Obesity on Willpower, Despite Evidence It's Genetic*, N.Y. TIMES (Nov. 1, 2016), https://www.nytimes.com/2016/11/01/health/americans-obesity-willpower-genetics-study.html; Valena Elizabeth Beety, *Criminality and Corpulence: Weight Bias in the Courtroom*, 11 SEATTLE J. FOR SOC. JUST. 523, 523–24 (2013) ("American society condemns size and weight because individuals as viewed as personally responsible for their bodies. . . . Focusing on individual responsibility denies the roles of geography, culture, poverty, and genetics in shaping size."). *See generally* Adam Benforado et. al., *Broken Scales: Obesity and Justice in America*, 53 EMORY L.J. 1645, 1724 (2004).

## IV.  CONCLUSION

For these reasons, Plaintiff's motion for summary judgment is **GRANTED**, and the Commissioner's motion for summary judgment is **DENIED**. The case is **REMANDED** to the Commissioner, who shall assign this case to a different ALJ and conduct further proceedings consistent with this opinion. An order will issue separately.

Signed on March 27, 2017, at Houston, Texas.

_____
Dena Hanovice Palermo
United States Magistrate Judge